JAMES LAWRENCE,
      Plaintiff,

      v.

ALTICE USA,
      Defendant.

No. 3:18-cv-1927 (SRU)

## RULING ON MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

In this case, Altice USA ("Altice") moves to dismiss James Lawrence's ("Lawrence")

amended complaint, or in the alternative, for summary judgment. Lawrence's amended

complaint alleges, essentially, that Altice defamed him when it referred to him as a "stalker" in a

series of television and print news reports. On December 19, 2019, I held a hearing in this

matter and took the instant motion under advisement. I now **grant** Altice's motion for summary

judgment because the statements at issue are substantially true and are not defamatory.

## I.      Nature of the Motion

This motion was styled as one to dismiss, or, in the alternative, for summary judgment.

A Rule 12(b)(6) motion to dismiss is confined to the pleadings; if "matters outside the pleadings

are presented to and not excluded by the court, the motion must be treated as one for summary

judgment under Rule 56." Fed. R. Civ. P. 12(d). "All parties must be given a reasonable

opportunity to present all the material that is pertinent to the motion." *Id.* The major harm of

considering extrinsic materials on a Rule 12(b)(6) motion is "the lack of notice that the material

may be considered." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). When the plaintiff

"has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *See id.* (internal quotation marks and citation omitted).

In the Second Circuit, a court may consider extrinsic materials on a Rule 12(b)(6) motion without converting it to a Rule 56 motion if the materials are either (1) integral to the complaint, or (2) facts appropriate for judicial notice. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006). For materials to be "integral" to a complaint, the plaintiff must have relied on those materials in drafting the complaint; it is not enough that the plaintiff had mere notice or possession of them. *See id.* (citing *Chambers*, 282 F.3d at 152–53). Courts may take judicial notice of facts "not subject to reasonable dispute" either because they are generally known in the relevant community or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

It is an open question in the Second Circuit whether courts can take judicial notice of police incident reports, but it seems that many courts refrain from doing so. *See, e.g.*, *Alvarez v. County of Orange, N.Y.*, 95 F. Supp. 3d 385, 398 (S.D.N.Y. 2015); *Bejaoui v. City of New York*, 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 21, 2015); *Serrata v. Givens*, 2019 WL 1597297, at *4 (E.D.N.Y. Apr. 15, 2019). A court may take judicial notice of recordings, articles, and transcripts when a plaintiff in a defamation action either submits them or clearly relies on them and if taking them into account would not create unfairness to either party. *See, e.g.*, *Condit v. Dunne*, 317 F. Supp. 2d 344, 357–58 (S.D.N.Y. 2004) (all three); *Goldman v. Barrett*, 2017 WL 4334011, at *2 n.4 (S.D.N.Y. July 25, 2017) (article); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007) (article, even when submitted by defendants).

I will treat the instant motion as one for summary judgment. Although I believe, under the foregoing standards, I could take into consideration some of Altice's submissions without converting this motion into one for summary judgment, I will not do so. For one, at the hearing I held on December 19, 2019, Lawrence requested that I treat this motion as one for summary judgment, and Altice did not object. In addition, Lawrence has submitted evidence that fairness dictates I consider. Thus, I will treat this motion as one for summary judgment and take into consideration all the evidence that has been presented.

## II.      Standard of Review for Summary Judgment

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to

establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

### III.  Background

A.  <u>Procedural History</u>

Lawrence, proceeding *pro se*, filed a complaint for defamation against Altice on November 28, 2018.  Compl., Doc. No. 1.  Lawrence alleged both slander and libel.  *Id*. at 9–10. Lawrence claimed that one of Altice's subsidiaries—News 12 Connecticut ("News 12")— broadcast television segments and published online articles that defamed him in various ways. *See id.* at 7–8 (listing six ways).  Altice made a motion to dismiss the complaint on December 21, 2018.  *See* Mot. to Dismiss, Doc. No. 12.  At a hearing on Altice's motion to dismiss on May 9, 2019, I granted Altice's motion in substantial part but denied it with respect to one aspect of Lawrence's defamation claim: that News 12's use of the word "stalker" in its reports inaccurately portrayed Lawrence, who was in fact arrested on a breach of peace charge.  *See* Min. Entry, Doc. No. 30.  I granted Lawrence leave to file an amended complaint that addressed only the "stalking" issue and fixed a jurisdictional defect in his initial pleading.[1]  Lawrence, at the second try,[2] filed an amended complaint.  *See* Am. Compl., Doc. No. 36.  Lawrence's amended complaint attempted to address the jurisdictional defect but did not narrow his allegations in any meaningful way.  Altice made a motion to dismiss, or, in the alternative, for summary judgment.  *See* Mot. to Dismiss, or for Summ. J. ("Mot. for Summ. J."), Doc. No. 39. Lawrence has filed numerous responses, *see, e.g.*, Doc. Nos. 40, 41, 42, 45, 47, 48, 49, 51, 53, 56, 59, 60.  Many of those responses are essentially duplicative of—and reference—his earlier responses.  *See* Doc. Nos. 20, 26, 29.  The Defendants have filed a reply, *see* Doc. No. 44, and a

---

[1] Lawrence initially pled jurisdiction under 28 U.S.C. § 4101, which merely defines "defamation" for the purposes of recognizing foreign judgments and is not a basis for federal court subject matter jurisdiction.
[2] Lawrence's first attempt was inadequate.  *See* Notice, Doc. No. 35.

sur-reply, *see* Doc. No. 52-1.[3]  Both sides have submitted extrinsic evidence, and I have considered all of it that is relevant.

B.  Facts[4]

On November 5, 2017, Lawrence began following a woman inside a Fresh Market grocery store in Westport and then followed her into the parking lot and to her car.  *See* Def.'s Local Rule 56(a)(1) Stmnt ("56(a)(1) Stmnt"), Doc. No. 39-2, at ¶ 2.  Lawrence's actions made the woman sufficiently uncomfortable that she called the Westport Police Department ("WPD").  *See id.*  By the time a WPD officer arrived at the Fresh Market, Lawrence was gone, but the store manager told the officer that Lawrence had been involved in similar incidents before.  *See id.* at ¶ 3.  Later that day, the store manager called the police to return to Fresh Market because Lawrence had come back to return a $100 bill he said he found on the ground in the store.  *See id.* at ¶ 4.  The officer returned and spoke with Lawrence, who explained that he had approached the woman's car to ask if the $100 bill was hers.  *See id.*  Lawrence "became very agitated" when the officer asked Lawrence why—if he found money on the ground and was trying to return it—he left the store with the money and then returned with it later.  *See id.*  The officer believed, in fact, that Lawrence left Fresh Market to retrieve a $100 bill, and then returned to the grocery store so that he had a cover story.  *See id.* at ¶ 6.  I refer to this incident throughout as the "November 5 Incident."

At a later date, the officer investigated Lawrence and found a lengthy history of similar incidents with the WPD, including "10 case incidents logged from 2002 [until] present" where

[3] Technically, Altice moved for leave to file a sur-reply, *see* Doc. No. 52, which I granted, *see* Order, Doc. No. 55. Altice never subsequently filed its sur-reply, but it attached a "proposed" sur-reply when it moved for leave to file a sur-reply.  *See* Doc. No. 52-1.  I take that proposed sur-reply to be submitted as Altice's sur-reply.
[4] Many of the facts are taken from Altice's Local Rule 56(a)(1) statement.  Lawrence filed a Local Rule 56(a)(2) statement that essentially denies or caveats every fact asserted in Altice's 56(a)(1) statement.  *See* Pl.'s Local Rule 56(a)(2) Stmnt, Doc. No. 48.  I have taken all of Lawrence's objections into consideration.

Lawrence "was seen following the complainants around a store or coffee shop and then following them out to their cars where he would either stare at them or get right into their personal space." *See id.* The officer also learned that many more similar incidents had not been reported to the police. *See id.* at ¶ 7. Further, the officer learned that there was a current protective order in effect against Lawrence. *See id.* at ¶ 5. In addition, the officer learned that Lawrence had an arrest record in Florida (resisting arrest, fleeing/eluding police) and California (petty theft, theft of personal property, stalking, inflicting corporal injury to spouse, battery of spouse). *See id.* at ¶ 8.

On March 5, 2018, Lawrence was arrested for breach of peace in the second degree for his role in the November 5 Incident. *See id.* at ¶ 1 (citing Conn. Gen. Stat. § 53a-181). Lawrence was arraigned on the same charge on March 14. *See id.* The same day, a News 12 reporter interviewed Lawrence at his house, and Lawrence told the reporter that he did nothing wrong. Am. Compl., Doc. No. 36, at 1. News 12 reported the story of Lawrence's arrest on its television broadcast as well as online throughout March 14 and 15. 56(a)(1) Stmnt, Doc. No. 39-2, at ¶ 9. There are six discrete instances of reporting that are at issue in this case: TV Reports 1 through 4 and Articles 1 and 2.

1. *TV Reports*

TV Report 1 ran at 9:01 pm on March 14. It began: "A Westport man is facing charges tonight for allegedly stalking several women around town." Tr. of TV Report 1, Ex. B to Mot. for Summ. J., Doc. No. 39-5, at 2. The broadcast also reported that the police said that Lawrence: "was named in 10 cases involving women in local stores"; had "a history of following women around a store and then out to their car where he would either stare at them or get right in their personal space"; "turned himself in last week to face charges of doing the same thing to

other women"; still had a protective order against him; and "faced similar charges in California." *Id*. at 2–3. TV Report 1 also reported that Lawrence was charged with breach of peace for the November 5 Incident. *Id*. at 3. TV Report 1 included an interview from an unnamed woman ("Parking Lot Complainant") whose face was indiscernible and said that Lawrence followed her to her car in a Whole Foods parking lot "months ago." *See id.* at 2. The Parking Lot Complainant said: "This is a guy that you know is walking around the grocery stores preying on women and it's really frightening to wonder what could possibly happen." *Id.* (I will refer to this quote as the "preying on women" quote.) TV Report 1 also included a portion of Lawrence's interview in which he explains that he did "not break any laws," was "not guilty," and only "approach[ed] a girl and that was it." *Id*. at 2–3.

TV Report 2, which ran at 9:33 pm on March 14, was substantially similar to TV Report 1. It began slightly differently: "Police say a Westport man is facing charges tonight for allegedly stalking women around local supermarkets." Tr. of TV Report 2, Ex. C to Mot. for Summ. J., Doc. No. 39-6, at 2. TV Report 2 included some of the same reports of what "police say": that Lawrence was named in 10 cases in local stores, that he faced similar charges in California, that there is a protective order against him, and that he turned himself in last week. *Id.* at 2–3. However, TV Report 2 neither mentioned that Lawrence was charged with breach of peace nor quoted Lawrence. The Parking Lot Complainant was again mentioned, and her "preying on women" quote was again broadcast. *See id.* at 2. During the first six seconds of TV Report 2, the News 12 anchor appeared beside a graphic of handcuffs under which was written: WOMEN FOLLOWED. *See* TV Report 2, Ex. C to Pl.'s Response, Doc. No. 50, at 0:00 to 0:06.[5]

---

[5] Lawrence submitted a DVD with four video clips on it. *See* Pl.'s Response, Doc. No. 50. The clips all depict News 12 broadcasts. The first (NEWS12SLANDER-A) ("Ex. A") and fourth (NEWS12SLANDER-D) ("Ex. D")

TV Report 3, which ran multiple times between 5:00 am and 9:00 am on March 15, began in the same way as TV Report 1. *See* Tr. of TV Report 3, Ex. D to Mot. for Summ. J., Doc. No. 39-7, at 2. TV Report 3 was, again, substantially similar to TV Reports 1 and 2. In it, News 12 reported that "police say" that Lawrence: "has a history of following women around local grocery stores and out to their cars"; has "been involved in 10 cases"; "turned himself in last week for doing the same thing to other women"; had faced similar charges in California; and has a protection order filed against him. *Id.* at 2–3. TV Report 3 mentioned the Parking Lot Complainant and included the "preying on women" quote. *Id.* at 2. TV Report 3 omitted mention of the breach of peace charge and did not include Lawrence's interview segments.

Lawrence has identified a fourth segment—TV Report 4—since he filed his amended complaint. *See* TV Report 4, Exs. A and D to Pl.'s Response, Doc. No. 50. Neither party has explained when TV Report 4 ran, but it was almost certainly the morning of March 15.[6] TV Report 4, again, was substantially similar to TV Reports 1, 2, and 3. TV Report 4 begins: "A Westport man is facing charges this morning for allegedly stalking several women at local grocery stores." *See* Tr. of TV Report 4, Ex. K to Def.'s Sur-Reply, Doc. No. 52-1. TV Report 4 explains that "police say" that Lawrence: had a history of following women in stores and out to their cars; has been involved in ten cases; turned himself in last week for a separate similar incident; faced similar charges in California; and has a protection order filed against him. *See id.* at 6–7. TV Report 4 mentions an unidentified complainant (the "Stop & Shop Complainant")

clips appear identical, and they correspond to the Transcript of TV Report 4. The other two clips appear to correspond to TV Reports 1 (NEWS12SLANDER-B) ("Ex. B") and 2 (NEWS12SLANDER-C) ("Ex. C"). While NEWS12SLANDER-C appears to correspond to the transcript of TV Report 2, the timing seems off. Altice says that TV Report 2 ran at 9:33 pm on March 14, but in NEWS12SLANDER-C, the clock in the lower-right hand corner of the screen reads 9:59. I believe that the same segment may have run twice on the evening of March 14 and that the parties simply did not catch that difference.

[6] The News 12 anchor in TV Report 4 says "Good Morning" to her colleagues and also says: "He appeared in court for the first time yesterday." *See* Tr. of TV Report 4, Ex. K to Def.'s Sur-Reply, Doc. No. 52-1, at 6–7. Lawrence appeared in court to be arraigned on March 14. *See* Am. Compl., Doc. No. 36, at 1.

from an incident at Stop & Shop "a few months back." *See id.* at 6. However, the Stop & Shop

Complainant is plainly the Parking Lot Complainant.[7] TV Report 4 also includes Lawrence's

interview segment in which he says he is "not guilty." *See id.* TV Report 4 is unique in one

way, though: During TV Report 4, several graphics are displayed. First, for about 17 seconds

while a reporter introduces the story, a television beside the reporter reads: STALKING

ARREST. *See* TV Report 4, Ex. A to Pl.'s Response, Doc. No. 50, at 0:11–0:28; TV Report 4,

Ex. D to Pl.'s Response, Doc. No. 50, at 0:06–0:24. Next, for over 25 seconds, a banner at the

bottom right of the screen reads: Stalking Charges: Westport. *See id.* at 0:30–0:55; *see id.* at

0:26–0:58. Finally, the STALKING ARREST screen returns. *See id.* at 1:08–1:20; *see id.* at

1:02–1:14.

### 2. *Articles*

News 12 also made available two print articles online on the evening of March 14

("Article 1") and morning of March 15 ("Article 2").[8] Both had the same headline—"Police:

Westport man charged with stalking women"—and first sentence—"A Westport man is facing

charges for allegedly stalking several women around town." *See* Article 1, Ex. 2 to Pl.'s Mem.

in Opp'n, Doc. No. 48-2, at 1; Article 2, Ex. 1 to Pl.'s Mem. in Opp'n, Doc. No. 48-1, at 1.

Other than their headlines, Articles 1 and 2 are substantially similar to the TV Reports. Article 1

cites the arrest warrant, investigators, officials, and authorities as saying that Lawrence: is named

---

[7] For one, the Stop & Shop Complainant gives the same "preying on women" quote as the Parking Lot Complainant. *See* Tr. of TV Report 4, Ex. K to Def.'s Sur-Reply, Doc. No. 52-1, at 7. In addition, the silhouetted figure identified as the Stop & Shop Complainant in TV Report 4 appears identical to the silhouetted figure identified as the Parking Lot Complainant in TV Reports 1 and 2. *Compare* TV Report 4, Ex. A to Pl.'s Response, Doc. No. 50, at 0:56-1:03 *and* TV Report 4, Ex. D to Pl.'s Response, Doc. No. 50, at 0:52–0:56 *with* TV Report 1, Ex. B to Pl.'s Response, Doc. No. 50, at 0:35–0:42, 1:21–1:25 *and* TV Report 2, Ex. C to Pl.'s Response, Doc. No. 50, at 0:45–0:53.

[8] Lawrence asked Altice to take down Articles 1 and 2, and Altice did so, which means they are no longer available. *See* Def.'s Mem. of Law in Supp. Mot. for Summ. J. ("Def.'s Mem."), Doc. No. 39-1, at 6. Lawrence submitted print-outs of Articles 1 and 2 in his Reponses. *See* Doc. Nos. 48-1 and 48-2. Altice has responded to the Articles but says it "cannot confirm, but does not have a reason to doubt, the authenticity of the Articles." *See* Def.'s Mem., Doc. No. 39-1, at 6.

in 10 different cases; turned himself in last week; has a history of following women around a store and following them out to their cars; still has a protective order against him; and is facing similar charges in California. *See* Article 1, Ex. 2 to Pl.'s Mem. in Opp'n, Doc. No. 48-2, at 1. Article 1 also mentions the Parking Lot Complainant. *See id.* Finally, Article 1 reports that Lawrence was charged with breach of peace in November. *Id.* Article 2 is almost identical to Article 1 except that Article 2 (a) includes the "preying on women" quote and attributes it to the Stop & Shop Complainant and (b) includes Lawrence's quote about his innocence. *Id.*

3. *Other Incidents*

Most of the pages of briefing in this case regard other instances of Lawrence's misconduct. Altice has sought to show that it was substantially true to characterize Lawrence's behavior over time as "stalking" by more clearly articulating the behavior underlying the "10 cases" referenced in the reports. *See* 56(a)(1) Stmnt, Doc. No. 39-2, at ¶¶ 20–27 (eight specific incidents in Connecticut between 2002 and 2017); *id.* at ¶ 28 (noting four unreported incidents). Altice has submitted the WPD incident reports for some of those complaints. *See, e.g.*, Incident Report, Ex. F to Mot. for Summ. J., Doc. No. 39-9 (2017 incident in Fresh Market parking lot); Incident Report, Ex. G to Mot. for Summ. J., Doc. No. 39-10 (2017 incident in Whole Foods parking lot); Incident Report, Ex. I to Def.'s Reply, Doc. No. 44-2 (reporting a "possible stalking incident" over a period of months in 2006 spanning numerous locations, including two parking lots); Incident Report, Ex. J to Def.'s Reply, Doc. No. 44-3 (reporting a "stalking complaint" over a period of two days in 2003 spanning a Barnes and Noble and New York Sports Club).

Lawrence takes issue with Altice's characterizations: Lawrence undertakes his own review of the ten "complaints/incident reports from 2002-2017" and finds that "[t]here are 6 girls

involved with making a complaint (not 10) and only 3 times is being around a car/parking lot involved with the complaint." *See* Response, Doc. No. 26-1, at 1–7.

The parties also disagree vociferously about an incident that occurred in September 2018. *See* 56(a)(1) Stmnt, Doc. No. 39-2, at ¶ 18; Def.'s Mem. of Law in Supp. Mot. for Summ. J. ("Def.'s Mem."), Doc. No. 39-1, at 6; Incident Report, Ex. E to Def.'s Mot. for Summ. J., Doc. No. 39-8 (redacted); Responses, Doc. Nos. 40, 41, 42, and 47. But the news reports at issue in this case were published in March 2018. No matter how gross Lawrence's behavior in September 2018, an incident that occurred *after* the publication of reports at issue in this case has no bearing on the truth of those reports. Thus, I find that incident irrelevant.

## IV. Discussion

### A. Altice's References to Lawrence's Behavior as "Stalking"

The question here is whether Altice defamed Lawrence in the six news reports at issue by referring to him as a "stalker" or to his activity as "stalking." Altice claims that all the statements at issue are not defamatory because they are substantially true. *See* Def.'s Mem., Doc. No. 39-1, at 9–15. In the alternative, Altice claims that the statements are protected as statements of opinion based on disclosed facts. *See id.* at 15 n.6. Lawrence counters, generally, that the statements are defamatory because they were false and met all the other requirements of defamation. *See* Response, Doc. No. 41. Altice is entitled to summary judgment because all the statements at issue were substantially true.

Altice argues that Lawrence bears the burden to establish that the "gist" of its reports was false. *See* Def.'s Mem., Doc. No. 39-1, at 11. However, Altice explains that a reasonable lay person would understand Lawrence's conduct—not only in the November 5 Incident but also in other instances—to be "stalking." *See id.* at 12, 14. Altice explains that referring to Lawrence's

behavior as "stalking" was substantially true even though Lawrence was never arrested in Connecticut for the *crime* of stalking because such minor legal inaccuracies are "of no legal consequence." *See id.* at 12–13.

Lawrence claims that it was false to label him a "stalker" or his behavior as "stalking." *See* Response, Doc. No. 41, at 2. To that end, Lawrence argues that he has never been arrested for—and his behavior has not fit the elements of—the crime of stalking in Connecticut, which requires *repetitive* behavior toward an individual. *See* Conn. Gen. Stats. §§ 53a-181d (second degree); and 53a-181e (third degree). Lawrence argues that the November 5 Incident involved a one-time encounter, and so his behavior clearly was *not* stalking. *See* Response, Doc. No. 40, at 6–8; Response, Doc. No. 20, at 6–9.

Defamation claims are "rooted in the state common law" but draw heavy influence from the minimum standards of the First Amendment. *See Gleason v. Smolinski*, 319 Conn. 394, 430 (2015). To demonstrate a prima facie case of defamation in Connecticut, a plaintiff must show that (1) the defendant published a defamatory statement that (2) identified the plaintiff to a third person, (3) was published to a third person, and (4) led to the plaintiff's reputation suffering an injury. *See id.* A defamatory statement is a communication that harms another's reputation. *See id.* at 431. "[T]ruth is an affirmative defense to defamation." *Cweklinsky v. Mobil Chemical Co.*, 267 Conn. 210, 228–29 (2004). Indeed, "substantial truth provides an affirmative defense." *See Skakel v. Grace*, 5 F. Supp. 3d 199, 207 (D. Conn. 2014).

A defendant's statements are substantially true when "the main charge, or gist, of the libel [or defamation] is true," and "minor errors that do not change a reader's perception of the statement do not make the statement actionable." *Id.* (citing *Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 322 (1984)). "The issue is whether the libel [or slander], as published, would

have a different effect on the reader [or listener] than the pleaded truth would have produced." *See id.* (citing *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 113 (1982)). "For purposes of assessing the truth of the allegedly defamatory phrase . . . , the court must view it from the mind of the average reader, taken by its popular acceptation, not its technical meaning." *Acker v. Conn. Newspapers Pub. Co.*, 2013 WL 541160, at *4 (Conn. Super. Ct. Jan. 11, 2013) (citing Restatement (Second) of Torts § 581A cmt. f (1977)). "Particular words or statements must be viewed, not in isolation, but in terms of the context of the entire communication." *Woodcock v. Journal Pub. Co., Inc.*, 230 Conn. 525, 554 (1994) (Berdon, *J.*, concurring) (citing *Yavis v. Sullivan*, 137 Conn. 253, 260 (1950)). "Inaccurate headlines are not libelous if they are correctly clarified by the text of an article." *Id.* (citing *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 624–25 (2d Cir. 1988)); *see also Colon v. Town of West Hartford*, 2001 WL 45464, at * 4–5 (D. Conn. Jan. 5, 2001) (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985) (New York law)). In a case brought by a private-figure plaintiff about a matter of public concern, the plaintiff bears the burden of proving falsity. *See Gleason*, 319 Conn. at 442–45 (citing, *inter alia, Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986); *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000)).

The "substantially true" inquiry is heavily fact-dependent. A New York court (discussing New York law) has remarked that "the cases addressing the extent to which a given statement is substantially true fall along a broad spectrum." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998). In the middle of that spectrum are cases in which "the stretch between the statement and the admitted truth" is tenuous, but "still the overall 'gist' or 'sting' cannot be said to be 'substantially' different." *Id.* at 368. When a case falls into this category, the substantial truth doctrine normally applies and bars liability for defamation.

*Jewell* itself was a middle category case. There, the plaintiff sued the *New York Post* for publishing an article referring to him as the "main" suspect in a terrorism investigation rather than "a" suspect, which was the truth. *See id.* at 367. The court found the *Post* not liable for defamation because the statements were "substantially true in light of his admission that he was 'a' suspect." *See id.* at 369. That is, despite the difference between the words "main" and "a," "a reasonable reader would not have reacted differently . . . based upon this difference in terminology. Under either usage, the main 'sting' or 'gist' of the overall content of the column was the same—Jewell was suspected of having planted the bomb and was being actively investigated by the authorities." *Id.*

Some courts in Connecticut have also found that statements mislabeling criminal activity are not defamatory because they are substantially true. For instance, in *Finnelli v. Tepfer*, the media defendant was found not liable for defamation when a headline read "Killing of Pet Rabbit, Threats Lead to Arrest"—even though the plaintiff had not been arrested for killing his pet rabbit and the police had not explicitly said that he killed the rabbit—because the report was substantially true. 2009 WL 1424688, at *2, *5 (Conn. Super. Ct. Apr. 24, 2009). The report was substantially true because the article reported numerous facts which "strongly indicate that the plaintiff killed the rabbit, or at the very least, that law enforcement believed he did" and because the actual truth would have had no different effect on the reader than the substantial truth that was already printed. *Id.* at *6. *See also Baia v. Jackson Newspapers, Inc., et al.*, 12 Media L. Rptr. 1780, at *2 (Conn. Super. Ct. Dec. 26, 1985) (no defamation when headline said plaintiff charged with "pulling off" largest bank robbery in history when, in fact, charged only with conspiracy because article clarified that fact, and difference between truth and headline would not have had different effect on readers).

Courts in other jurisdictions have reached similar holdings. For instance, in *Barnett v. Denver Publ'g Co.*, a Colorado appeals court held the newspaper defendant not liable for defamation when the defendant wrote that the plaintiff had been "convicted in a stalking incident" even though the plaintiff had been convicted only of harassment. 36 P.3d 145, 148 (Colo. App. 2001). The court noted that at the time of the plaintiff's offense, the court had described the offense as "almost stalking"; that at the time of the offense, both stalking and harassment were misdemeanors (now stalking was a felony); and that, despite the distinction between the two crimes, "both terms describe similar repeated, unsolicited behavior." *See id; see also Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 481–82 (7th Cir. 1981) (no defamation when "rape" used even though crime was second-degree sexual assault because "rape," as understood in common usage, truthfully described the conduct); *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 942 (Ariz. 1991) (en banc) (no defamation for reporting plaintiff fired his gun when he only displayed it because "the 'sting' of the two versions is not substantially different," and the full truth "would not have been any less damag[ing]"); *Sivulich v. Howard Publ'ns, Inc.*, 466 N.E.2d 1218, 1220 (Ill. Ct. App. 1984) (no defamation when reports said plaintiff charged with aggravated battery—even though only a civil case—because, commonly understood, "charged" "includes any assertion against an individual, including averments in a civil complaint," and context indicated it was a civil case); *Anderson v. Cramlet*, 789 F.2d 840, 844 (10th Cir. 1986) (no defamation when letter to the editor described behavior as "kidnapping" rather than violation of custody order because "in the popular sense of the word," the letter "truthfully and accurately described" the conduct); *Russin v. Wesson*, 183 Vt. 301, 304–05 (2008) (no defamation when non-media defendant characterized plaintiff as "thief"—even though plaintiff committed only conversion—because it was a "legally mistaken

but substantially accurate statement" especially because legal terms of art are "more broadly defined in lay usage").

In contrast, at least one Connecticut court has chosen not to apply the substantial truth defense where a media defendant wrote that a plaintiff had engaged in the incorrect type of crime. *See Acker*, 2013 WL 541160 at *7. But the circumstances there were much different from those here. In *Acker*, the plaintiff was a director of a non-profit animal shelter. *See id.* at *1. The *Connecticut Post* published a story about the plaintiff that claimed he had, in the past, pled guilty to a charge of animal cruelty; in fact, the plaintiff had "a confrontation with a family who had decided not to adopt one of his dogs" and pled guilty to breach of peace and failure to vaccinate. *See id.* at *3–4. The court found that the statement was *not* substantially true under the circumstances. Cruelty to animals was not clearly connected to breach of peace, either legally or in popular understanding. *See id.* at *5. Thus, a layperson might infer from the statement as published that "the plaintiff had engaged in intentional, malicious, or even sadistic infliction of suffering on animals, as opposed to mere neglect." *Id.* In contrast, the actual truth "could not have conveyed to a reasonable person such malicious and intentional conduct toward animals." *See id.* at *5. That is, the actual truth and the reported statement would *not* have produced the same effect on the reader; "[t]he difference is not merely superficial or technical." *See id.* The court explained that the reported statement "does not bear a close enough relation to the subject matter of the remainder of the article for the truth of the other statements to add to its veracity." *Id.*

This case is unlike *Acker* and more like all the other cases cited above. When Altice used the term "stalking" in its reports, it was not defamatory because, in context, the actual truth would have had no different effect on a reasonable reader. To be sure, the reports are not

17

entirely correct.  Recall that under Connecticut law, stalking implies a repeated behavior;[9] breach of peace does not.  Additionally, both legally[10] and in common parlance,[11] the term "breach of peace," taken on its own, certainly does not conjure the same vision of sexual predation that the term "stalking" does.[12]  Lawrence was never charged with the crime of stalking in Connecticut. For that reason, it was arguably inaccurate when all six reports said in their opening lines that Lawrence was "facing charges for allegedly stalking" women.  For the same reason, it was arguably inaccurate to show graphics in TV Report 4 that read "STALKING ARREST" and "Stalking Charges."  Finally, it was arguably inaccurate when the headlines in Articles 1 and 2 reported "Police: Westport man charged with stalking women."  Stalking and breach of peace are not identical.

However, that difference does not make the statements at issue defamatory.  When evaluating whether a statement is defamatory, "the court must view it from the mind of the average reader, taken by its popular acceptation, not its technical meaning."  *Acker*, 2013 WL 541160, at *4.  As Altice points out, Lawrence's conduct—both on November 5 and on numerous instances before—maps onto the common usage of the word "stalking."  Importantly, in common usage, "stalking" does not mean, necessarily, repeated behavior.  *See Stalk*, Random House Webster's Unabridged Dictionary (2d ed. 1998) ("[T]o pursue (game, a person, etc.) stealthily."); *Stalk*, The Merriam-Webster.com Dictionary, https://www.merriam-

---

[9] *See* Conn. Gen. Stat. § 53a-181e ("[W]illfully and repeatedly following or lying in wait . . . ") (third degree); Conn. Gen. Stat. § 53a-181d (requiring "course of conduct," which includes "two or more acts") (second degree).
[10] *See* Conn. Gen. Stat. § 53a-181 (criminalizing one-time fighting, assault, threats, threatening behavior, offensive actions, obscenity, general hazard).
[11] *See Breach of the Peace*, Random House Webster's Unabridged Dictionary (2d ed. 1998) ("[A] violation of the public peace, as by a riot, disturbance, etc."); *A Breach of the Peace*, The Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/breach%20of%20peace (last visited Jan. 4, 2020) ("[L]oud or violent behavior in a public place.").
[12] However, breach of peace, by criminalizing threatening behavior, does encompass stalking behavior.

webster.com/dictionary/stalk (last visited Jan. 4, 2020) ("[T]o pursue obsessively and to the point of harassment."[13]

Further, each report makes clear that the segment is *not* merely about Lawrence's most recent arrest, but the totality of his similar activity; in other words, the pieces were about Lawrence's similar conduct over time. All six reports mention that police say Lawrence had been involved in ten similar incidents involving women in local stores. All six pieces mention and include quotes from a complainant from an incident *separate from* the November 5 Incident. All six reports mention that Lawrence had been charged with similar incidents in California and that he was the subject of a protective order. All four TV Reports mention in their first sentence that the report was about "women" (plural) and three of the reports (1, 3, and 4) use the phrase "several women" even though only one woman was involved in the November 5 Incident. TV Report 1 and Articles 1 and 2 explicitly mention that Lawrence's November 5 Incident led to a breach of peace charge.

The graphics in TV Report 4 and the headlines in Articles 1 and 2 are the statements that appear the least "true." Still, none of those statements is defamatory. The graphics in TV Report 4 explain that the segment related to a "STALKING ARREST" and that these were "Stalking Charges." Those statements are not entirely true. But the rest of TV Report 4's content significantly dulls the impact of that inaccuracy. TV Report 4 mentions that police say Lawrence had a "history of following women around the stores and then out to their cars" and that he had "been involved in 10 cases." The segment reported on the Stop & Shop complainant and included the "preying on women" quote. The segment also reported that Lawrence had faced similar charges in California and had a protective order filed against him. Given the content of

---

[13] Even the generic *legal* definition of "stalking" does not require the "repeated" element of Connecticut's law. *See Stalking*, Black's Law Dictionary (11th ed. 2019) ("The act or an instance of following another by stealth.").

the segment, a reasonable reader would not have been affected differently had the graphics not appeared, or, instead, read "BREACH OF PEACE ARREST."

The same goes for Articles 1 and 2. Their headlines read: "Police: Westport man charged with stalking women." That is misleading if not outright false. But the remainder of the Articles, again, mitigates the problem. Both Articles explain that Lawrence was actually "charged [] with breach of peace for an incident back in November." In addition, both Articles explain that the arrest warrant mentions 10 similar incidents; Article 1 mentions the Parking Lot Complainant and Article 2 mentions the Stop & Shop Complainant; both mention Lawrence's similar charges in California and his protective order; and Article 2 includes the "preying on women" quote. The headlines are not defamatory because the average person reading the Articles would not have been affected differently if the headlines read, for instance, "Police: Westport man charged with breach of peace for following woman." Thus, the headlines are substantially true.

Lawrence contests the accuracy of some aspects of the reports unrelated to the statements that explicitly use the word "stalk." Lawrence claims that it was inaccurate to report that he had been involved in 10 similar cases; that he had a protective order against him; and to include a misleading interview with a complainant. *See, e.g.*, Response, Doc. No. 26-1, at 1, 6 (arguing that only three of the ten cases were similar and that the protective order expired by March 2018). Those challenges are not entirely beyond the scope of Lawrence's defamation challenge: If the body of the reports provides the context that makes the "stalking" statements not defamatory, it is important to determine whether the body of the reports are themselves true. Fortunately, this is an easy inquiry: none of Lawrence's complaints has merit.

First, regarding Lawrence's grievance about the complainant's interview, he is merely upset that News 12 interviewed the complainant and included her story. There is no dispute that what she said was reported faithfully. Thus, there is no issue of material fact here. Lawrence's other complaints are easily set aside by considering the Arrest Warrant Application. *See* Arrest Warrant Application, Ex. A to Def.'s Mot. for Summ. J., Doc. No. 39-4. In all six reports, News 12 reported that *police* (or "authorities" in the case of Article 2) *say* Lawrence (1) had been named in 10 similar cases, (2) faced similar charges in California, and (3) had a protective order filed against him. Those facts were plainly drawn from the Arrest Warrant Application: News 12 noted that "police sa[id]" those facts, and News 12 even cited the Arrest Warrant in TV Reports 1 and 2 and Article 1. Thus, those statements would be untrue only if police did *not* say them. The Arrest Warrant Application, which was authored by a WPD officer, makes it perfectly clear that the police *did* say the things that Lawrence disputes. *See id.*

Because I find that all the statements at issue were substantially true and not defamatory for that reason, I need not consider Altice's alternative argument that the statements are protected as statements of opinion based on disclosed facts. *See* Def.'s Mem., Doc. No. 39-1 at 15 n.6.

## C. Infliction of Emotional Distress Claim

In his Amended Complaint, Lawrence asserts a new, third claim for "emotional distress/mental anguish." *See* Am. Compl., Doc. No. 36, at 13. Below this heading, Lawrence lists: "Examples of ramifications/stories of being falsely portrayed as a 'stalker.' Therapy sessions. Costs of aspects of my life that I lost. Costs of attempts to re-establish myself. Letters/evidence from places I have been banned because of News 12. All 50+ ongoing Damages, ETC . . . all to be shared." *Id.* Altice claims that those "costs" overlap completely with Lawrence's complaints in his defamation causes of action and so this third claim should not

be construed as a new cause of action for infliction of emotional distress ("IED").  *See* Def.'s

Mem., Doc. No. 39-1, at 15–16.  Even if it were, Altice says, it is not properly pled because

Lawrence did not seek leave to amend his complaint to add a new cause of action.  *See id.* at 16

(citing Fed. R. Civ. P. 15(a)(2)).  And even if it were properly pled, Altice says, the IED claim

should be dismissed for the same reasons that the defamation claim should be: "the News

Reports are true."  *See id.*

As relevant here, under Fed. R. Civ. P. 15(a)(2), if a party is not entitled to amend its

pleading as a matter of course, then a party may amend its pleading only with the opposing

party's written consent or with the court's leave, which the court may give when justice so

requires.  "Generally, leave to amend should be freely given, and a *pro se* litigant in particular

should be afforded every reasonable opportunity to demonstrate that he has a valid claim."

*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citing *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir.

2000)).  Still, leave to amend may be denied when amendment would be futile.  *See id.* (citing

*Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006)).  "[A] plaintiff may not use a

claim for emotional distress to circumvent the established and carefully balanced framework of

constitutional and state libel law."  *Cowras v. Hard Copy*, 56 F. Supp. 2d 207, 209 (D. Conn.

1999) (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988)) (internal quotation marks

omitted).  Thus, a plaintiff may not recover damages "under the generally applicable laws of

intentional and negligent infliction of emotional distress where those claims are based on

constitutionally protected conduct."  *Id.* at 210.

There is no doubt that Lawrence's claim for IED is based on the same statements that I

have already found were substantially true: those are the only statements at issue in this case.  As

I have found, those statements are constitutionally protected.  If allowed to proceed, Lawrence's

IED claims "would amount to an end run around [] constitutional restrictions." *Id.* at 209. I cannot allow that. Thus, I will treat Lawrence's claim for IED as properly pled, but I will **grant** Altice's motion for summary judgment against it.

## V. Conclusion

I **grant** Altice's motion for summary judgment. Altice is not liable for defamation because the allegedly defamatory statements at issue are substantially true. The clerk is directed to enter judgment for Altice and to close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 9th day of January 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge